Of Counsel:
OGAWA, LAU, NAKAMURA & JEW
Attorneys-at-Law, A Law Corporation

MICHAEL F. O'CONNOR        1098-0
707 Richards Street, Suite 600
Honolulu, Hawaii  96813
Telephone: (808) 533-3999
Facsimile: (808) 535-1490
Email: mfoconnor@ollon.com

Attorney for Plaintiff
JORDAN JAMES SCHAEFER
and EVELYN COTTON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JORDAN JAMES SCHAEFER and EVELYN COTTON, <br><br>     Plaintiffs, <br><br> vs. <br><br> COSTCO WHOLESALE CORPORATION, a Washington corporation, SCENIC FRUIT COMPANY, LLC; and CALIFORNIA SPLENDOR INC., <br><br>     Defendants. | CIVIL NO.:_____ <br><br> **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

9560-001/385192

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiffs Jordan James Schaefer and Evelyn Cotton, by and through

their attorneys of record, Ogawa, Lau, Nakamura & Jew, and alleges upon information and

belief as follows:

## PARTIES

1. Plaintiff JORDAN JAMES SCHAEFER resides on Laelae Street, Kailua Kona, Hawaii, in the County of Hawaii, and is therefore a citizen of the State of Hawaii.

2. Plaintiff EVELYN COTTON resides on Laelae Street, Kailua Kona, Hawaii, in the County of Hawaii, and is therefore a citizen of the State of Hawaii.

3. Defendant COSTCO WHOLESALE CORPORATION is a corporation organized and existing under the laws of the State of Washington, with its corporate headquarters and principal place located in the State of Washington.

4. Defendant SCENIC FRUIT COMPANY, LLC, ("Defendant" or "Scenic") is a domestic for-profit limited liability company organized and existing under the laws of the State of Oregon, with its principal place of business located at 7510 SE Altman Road, Gresham, OR 97080, and is therefore considered a citizen of the State of Oregon. At all times relevant to this action, Defendant distributed and sold a variety of food products, including the Costco, "Kirkland Signature," frozen strawberries that caused the Plaintiffs' injuries, to customers throughout the country, including the Costco store in the State of Hawaii at issue in this matter.

5. Defendant CALIFORNIA SPLENDOR, INC. ("Defendant" or "California Splendor"), is a domestic for-profit corporation incorporated and existing under the laws of the State of California, with its principal place of business at 7684 Saint Andrews Avenue, San Diego, CA 92154, and is therefore considered a citizen of California. Upon information and belief, always relevant to this action, California Splendor distributed and sold a variety of food products, including the frozen strawberries that caused Plaintiffs' injuries, to customers around the country, including in the State of Hawaii. Upon

information and belief, California Splendor sold the frozen strawberries that caused Plaintiffs' injuries to Scenic in this matter.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. section 1332(a) because the matter in controversy far exceeds $75,000.00, exclusive of costs, and it is between citizens of different states.

2.    Venue in the United States District Court for the District of Hawaii is proper pursuant to 28 U.S.C. section 1391(b)(2) as a substantial part of the events giving rise to Plaintiffs' claims occurred in the District when Defendants distributed their product, and Plaintiffs purchased, consumed, and was sickened by Defendants' product there.

3.    Defendants are subject to personal jurisdiction in the District Court for the District of Hawaii as, always relevant to this matter, Defendants distributed a range of products, including the "Kirkland Signature" frozen strawberries that caused Plaintiffs' injuries, directly to stores in Washington, including the Costco store at which Plaintiffs purchased Defendants' product. As such, Defendants maintain minimum contacts with the District Court for the District of Hawaii such that maintenance of this suit in this Court is appropriate, fair, and just.

## GENERAL ALLEGATIONS

**The 2022-2023 Outbreak Linked to Frozen Strawberries**

1.    According to the Centers for Disease Control and Prevention (CDC), an outbreak of hepatitis A has been linked to frozen organic strawberries imported from certain farms in Baja California, Mexico by a common supplier.

3

2.     As of July 18, 2023, 10 outbreak-associated cases of hepatitis A had been reported, from four states, with illness dates ranging from November 24, 2022, to June 4, 2023, with ill people ranging in age from 38 to 64 years old, and four hospitalizations reported.

3.     Epidemiologic and traceback evidence collected by investigations by the CDC, FDA, and Washington state and local health departments indicate that frozen organic strawberries imported fresh from certain farms in Baja California, Mexico, in 2022 are the likely source of the outbreak.

4.     The hepatitis A virus strain causing illnesses in this outbreak is genetically identical to the strain that caused a 2022 hepatitis A outbreak linked to fresh strawberries imported from Baja California and sold at various retailers.

5.     All sick people interviewed during this investigation reported eating frozen organic strawberries in the 2-7 weeks before they became ill.

6.     In response to this investigation, Defendant Scenic Fruit Company, LLC, voluntarily recalled frozen organic strawberries, including those sold to Costco in Washington.

**The Hepatitis A Virus**

7.     Exposure to hepatitis A virus ("HAV") can cause an acute infection of the liver that is typically mild and resolves on its own. The symptoms and duration of illness vary a great deal, with many persons showing no symptoms at all. Fever and jaundice are two of the symptoms most commonly associated with HAV infection.

8.     Throughout history, hepatitis infections have plagued humans. The "earliest accounts of contagious jaundice are found in ancient China."

4

9. According to the CDC: The first descriptions of hepatitis (epidemic jaundice) are generally attributed to Hippocrates. Outbreaks of jaundice, probably hepatitis A, were reported in the 17th and 18th centuries, particularly in association with military campaigns. Hepatitis A (formerly called infectious hepatitis) was first differentiated epidemiologically from hepatitis B, which has a long incubation period, in the 1940s. The development of serologic tests allowed a definitive diagnosis of hepatitis B. In the 1970s, the identification of the virus and development of serologic tests helped differentiate hepatitis A from other types of non-B hepatitis.

10. Until 2004, HAV was the most frequently reported type of hepatitis in the United States. In the pre-vaccine era, the primary methods used for preventing HAV infections were hygienic measures and passive protection with immune globulin (IG). Hepatitis A vaccines were licensed in 1995 and 1999. These vaccines provide long-term protection against HAV infection.

11. Hepatitis A is the only common vaccine-preventable foodborne disease in the United States. This virus is one of five human hepatitis viruses that primarily infect the human liver and cause human illness. Unlike hepatitis B and C, hepatitis A does not develop into chronic hepatitis or cirrhosis, which are both potentially fatal conditions. Nonetheless, infection with the hepatitis A virus (HAV) can lead to acute liver failure and death.

12. Hepatitis A is a communicable (or contagious) disease that often spreads from person to person. Person-to-person transmission occurs via the "fecal-oral route," while all other exposure is generally attributable to contaminated food or water. Food-related outbreaks are usually associated with food contamination during preparation by an HAV-

5

infected food handler. The food handler is generally not ill because the peak time of infectivity—that is, when the most virus is present in the stool of an infected individual—occurs two weeks before illness begins.

13.    Fresh produce contaminated during cultivation, harvesting, processing, and distribution has also been a source of hepatitis A. In 1997, frozen strawberries were the source of a hepatitis A outbreak in five states. Six years later, in 2003, fresh green onions were identified as the source of an HAV outbreak traced to the consumption of food at a Pennsylvania restaurant. Other fruits and vegetables, such as blueberries and lettuce, have also been associated with HAV outbreaks in the U.S. as well as in other developed countries.

| Hepatitis A outbreaks associated with fresh, frozen, and minimally processed produce worldwide from 1983 to 2022 | | | | | |
|---|---|---|---|---|---|
| Year | # Cases | Implicated food | Location of cases | Source of implicated food | Suspected cause of contamination | Reference |
| 1983 | 24 | Raspberries (frozen) | Scotland | *Scotland* | Infected pickers or packers | Reid et al., 1987[1] |
| 1987 | 5 | Raspberries (frozen) | Scotland | *Tayside, Scotland* | Infected pickers | Ramsay and Upton, 1989[2] |
| 1988 | 202 | Iceberg lettuce | Kentucky | Unknown, suspected to be from Mexico | Believed to have occurred prior to distribution, since multiple restaurants involved | Rosenblum et al., 1990[3] |
| 1990 | 35 | Strawberries (frozen) | Montana, Georgia | California | Suspect an infected picker at farm | Sivapalasingam et al., 2004;[4] Niu et al., 1992[5] |
| 1996 | 30 | Salad ingredients | Finland | Imported salad ingredients | Unknown | Pebody et al., 1998[6] |
| 1997 | 256 | Strawberries (frozen) | Michigan, Maine, Wisconsin, Arizona, Louisiana, Tennessee | Grown in Mexico, processed and frozen at a single California facility a year | Inconclusive due to time between harvest and consumption, suspect barehanded contact with berries at harvesting, | Hutin et al., 1999[7] |

6

| | | | | | before consumption | coupled with few latrines and handwashing facilities on site | |
|---|---|---|---|---|---|---|
| 1998 | 43 | Green onions | Ohio | One of two Mexican farms or a farm in California | Believed to be contaminated before arrival at restaurant | Dentinger et al., 2001[8] |
| 2000 | 31 | Green onions or tomatoes | Kentucky, Florida | Green onions: California or Mexico Tomatoes: Unknown | Unknown | Wheeler et al., 2005[9]; Datta et al., 2001[10]; Fiore, 2004[11] |
| 2002 | 81 | Blueberries | New Zealand | *New Zealand, one orchard* | Inadequate bathroom facilities in fields, workers had barehanded contact with product, polluted groundwater from nearby latrines a possibility | Calder et al., 2003[12] |
| 2003 | 601 | Green onions | Pennsylvania, Tennessee, Georgia, North Carolina | Mexico, two farms | Contaminated during or before packing at farm | CDC, 2003[13]; Wheeler et al., 2005[14] |
| 2009 | 562 | Tomatoes (semidried) | Australia | Unknown; imported and domestic product involved | Product suspected to be imported due to concurrent outbreaks elsewhere at the time, source of contamination unknown | Donnan et al., 2012[15] |
| 2009 | 13 | Tomatoes (semidried) | Netherlands | Unknown; imported product suspected | Identical strain to the 2009 Australian outbreak | Petrignani et al., 2010[16] |
| 2010 | 59 | Tomatoes (semidried) | France | Likely Turkey, single batch of product | Unable to determine when and where contamination occurred. Virus was slightly different from one in the 2009 Australian and Dutch outbreaks. | Gallot et al., 2011[17] |

| 2012 | 9 | Pomegranate seeds (frozen) | Canada | Egypt | Suspect product contamination before export. Some history of travel to endemic areas among workers at Canadian processing facility, but less likely as only one product was associated with illness. | CDC 2013[18]; Swinkels et al., 2014[19] |
|---|---|---|---|---|---|---|
| 2013 | 103 | Strawberries (frozen) Other frozen berries may have been involved | Denmark, Finland, Norway, Sweden | Suspected Egypt and Morocco based on virus strain and import history | Unknown, some cases matched the strain of the larger 2013 European outbreak (see below) | Nordic Outbreak Investigation Team, 2013[20] |
| 2013 | 1589 | Berries (frozen) | Italy (90% of cases), Austria, Bulgaria, Denmark, England, Finland, France, Germany, Ireland, the Netherlands, Norway, Poland, Sweden | Multiple food items containing frozen mixed berries (cakes, smoothies); Bulgarian blackberries and Polish redcurrants were the most common ingredients in the implicated lots | Unknown, no single source found. Some cases also related to travel to Italy. | Severi et al., 2015[21]; EFSA 2014[22]; Chiapponi et al., 2014[23]; Rizzo et al., 2013[24]; Guzman-Herrador et al., 2014[25]; Fitzgerald et al., 2014[26] |
| 2013 | 165 | Pomegranate arils (frozen) | Arizona, California, Colorado, Hawaii, New Hampshire, New Jersey, New Mexico, Nevada, Utah, Wisconsin | Turkey | Unknown | Collier et al., 2014[27]; CDC 2013[28] |
| 2016 | 143 | Strawberries (frozen) | Arkansas, California, Maryland, New York, North | Egypt | Unknown | CDC 2016[29] |

8

| | | | Carolina, Oregon, Virginia, West Virginia, Wisconsin | | | |
|---|---|---|---|---|---|---|
| 2022 | 29 | Strawberries (frozen) | California, Minnesota, North Dakota, Canada | Mexico | Unknown | CDC 2022[30] |

14.    HAV is relatively stable and can survive for several hours on fingertips and hands and up to two months on dry surfaces.[31] The virus can be inactivated by heating to 185°F (85°C) or higher for one minute or by disinfecting surfaces with a 1:100 dilution of household bleach in tap water.[32] HAV can still be spread from cooked food if it is contaminated after cooking.[33]

15.    Although ingestion of contaminated food is a common means of spread for HAV, it may also be spread by household contact among families or roommates, sexual contact, or direct inoculation from persons sharing illicit drugs.[34] Children are often asymptomatic or have unrecognized infections and can pass the virus through ordinary play, unknown to their parents, who may later become infected from contact with their children.[35]

16.    Hepatitis A may cause no symptoms at all when it is contracted, especially in children.[36] Asymptomatic individuals will only know they were infected (and have become immune, given that you can only get hepatitis A once) by getting a blood test later in life.[37] Approximately 10 to 12 days after exposure, HAV is present in blood and is excreted via the biliary system into the feces.[38] Although the virus is present in the blood, its concentration is much higher in feces.[39] HAV excretion begins to decline at the onset of clinical illness and decreases significantly by 7 to 10 days after the onset of symptoms.[40]

Most infected persons no longer excrete the virus in their feces by the third week of illness. Children may excrete HAV longer than adults.

17.     Seventy percent of HAV infections in children younger than six years of age are asymptomatic; in older children and adults, infection tends to be symptomatic, with more than 70% of those infected developing jaundice.[41] Symptoms typically begin about 28 days after contracting HAV but can begin as early as 15 days or as late as 50 days after exposure.[42] The symptoms include muscle aches, headache, anorexia (loss of appetite), abdominal discomfort, fever, and malaise.[43]

18.     After a few days of typical symptoms, jaundice (also termed "icterus") sets in.[44] Jaundice is a yellowing of the skin, eyes, and mucous membranes that occurs because bile flows poorly through the liver and backs up into the blood.[45] The urine will also turn dark with bile, and the stool will be light or clay-colored from lack of bile.[46] When jaundice sets in, initial symptoms such as fever and headache begin to subside.[47]

19.     In general, symptoms usually last less than two months, although 10% to 15% of symptomatic persons have prolonged or relapsing disease for up to 6 months.[48] It is not unusual, however, for blood tests to remain abnormal for six months or more.[49] Jaundice so commonly associated with HAV can also linger for a prolonged period in some infected persons, sometimes as long as eight months or more.[50] Additionally, pruritus, or severe "itchiness" of the skin, can persist for several months after the onset of symptoms. These conditions are frequently accompanied by diarrhea, anorexia, and fatigue.[51]

20.     Relapse is possible with hepatitis A, typically within three months of the initial onset of symptoms.[52] Although relapse is more common in children, it does occur with some regularity in adults.[53] The vast majority of persons who are infected with hepatitis A

fully recover and do not develop chronic hepatitis.[54] Persons do not carry HAV long-term, as with hepatitis B and C.[55]

21.    Fulminant hepatitis A, or acute liver failure, is a rare but devastating complication of HAV infection.[56] As many as 50% of individuals with acute liver failure may die or require emergency liver transplantation.[57] Elderly patients and patients with chronic liver disease are at higher risk for fulminant hepatitis A.[58] In parallel with a declining incidence of acute HAV infection in the general population, however, the incidence of fulminant HAV appears to be decreasing.[59]

22.    HAV infects the liver's parenchymal cells (internal liver cells).[60] Once a cell has been penetrated by the viral particles, hepatitis A releases its own toxins that cause, in essence, a hostile takeover of the host's cellular system.[61] The cell then produces new viral components that are released into the bile capillaries or tubes that run between the liver's parenchymal cells.[62] This process results in the death of liver cells, called hepatic necrosis.[63]

23.    The fulminant form of hepatitis occurs when this necrotic process kills so many liver cells—upwards of three-quarters of the liver's total cell count—that the liver can no longer perform its job.[64] Aside from the loss of liver function, fulminant hepatic failure can lead to encephalopathy and cerebral edema.[65] Encephalopathy is a brain disorder that causes central nervous system depression and abnormal neuromuscular function.[66] Cerebral edema is a swelling of the brain that can result in dangerous intracranial pressure.[67] Intracranial hypertension leading to brain stem death and sepsis with multiple organ failure are the leading causes of death in individuals with fulminant hepatic failure.[68]

24.    Hepatitis A is much more common in countries with underdeveloped sanitation systems and, thus, is a risk in most of the world.[69] An increased transmission rate is seen in all countries other than the United States, Canada, Japan, Australia, New Zealand, and the countries of Western Europe.[70] Nevertheless, infections continue to occur in the United States, where approximately one-third of the population has been previously infected with HAV.[71]

25.    Each year, approximately 30,000 to 50,000 cases of hepatitis A occur in the United States.[72] Historically, acute hepatitis A rates have varied cyclically, with nationwide increases every 10 to 15 years.[73] The national rate of HAV infections has declined steadily since the last peak in 1995.[74] Although the national incidence—1.0 case per 100,000 population—of hepatitis A was the lowest ever recorded in 2007, it is estimated that asymptomatic infections and underreporting kept the documented incidence-rate lower than it actually is. In fact, it is estimated that there were 25,000 new infections in 2007.[75]

**Plaintiffs' Hepatitis A Illness**

26.    Plaintiffs purchased Kirkland Signature frozen organic strawberries from Costco on March 2023 and consumed the strawberries multiple times in March, 2023 through May, 2023.

27.    The Kirkland Signature frozen organic strawberries that Plaintiffs purchased were sold to Costco by Defendant Scenic and sourced by Scenic from Defendant California Splendor.

28.    On or about mid-March 2023, Plaintiffs began to develop symptoms consistent with HAV, including nausea, abdominal and torso pain, dark urine, and extreme fatigue.

29.    Plaintiffs has sustained serious personal injuries; suffered, and will continue to suffer, significant pain and other physical discomforts; incurred, and will continue to incur, substantial medical expenses; and remains at risk for future health complications with damages far more than $75,000.00, the jurisdictional threshold of this Court.

## CAUSES OF ACTION

**Count I – Strict Products Liability**

30.    Plaintiffs repeats and realleges all the above allegations contained in paragraphs 1-35.

31.    At all times relevant hereto, the Defendants were the manufacturer, packager, distributor and/or seller of the adulterated and/or harmful food product that was consumed by Plaintiffs.

32.    The adulterated and/or harmful food product that the Defendants manufactured, packaged, distributed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use by the intended public, including Plaintiffs, because Defendants' product was adulterated and/or harmful to human health by virtue of being contaminated with HAV.

33.    The adulterated and/or harmful food product that Defendants manufactured, packaged, distributed, and/or sold was delivered to Plaintiffs without any change in its defective condition. The adulterated and/or harmful food product that Defendants manufactured, packaged, distributed, and/or sold was consumed by Plaintiffs in the manner expected and intended.

34.    Defendants owed a duty of care to the public, including Plaintiffs, to manufacture, package, distribute and/or sell food that was not adulterated and/or harmful and that was free of pathogenic bacteria or other substances injurious to human health. Defendants breached this duty.

35.    Defendants owed a duty of care to the public, including Plaintiffs, to manufacture, package, distribute and/or sell food that was fit for human consumption and that was safe to consume to the extent contemplated by a reasonable consumer. Defendants breached this duty.

36.    As a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated and/or harmful food product that Defendants manufactured, packaged, distributed and/or sold, as set forth above, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

**Count II – Breach of Warranty**

37.    Plaintiffs repeat and reallege all the above allegations contained in paragraphs 1-42.

38.    Defendants are liable to the Plaintiffs for breaching express and implied warranties that it made regarding its food product that Plaintiffs purchased and consumed. These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use. Specifically, Defendants expressly warranted, through the sale of food to the public and by the statements and conduct of their employees and agents, that the food they manufactured, packaged, distributed and/or sold was fit for human consumption and not otherwise adulterated and/or injurious to human health.

39. The adulterated and/or harmful food product that Defendants sold, and Plaintiffs consumed would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

40. The adulterated and/or harmful food product sold to Plaintiffs was not fit for the uses and purposes intended, *i.e.,* human consumption; thus, the sale of this product to Plaintiffs constituted a breach of the implied warranty of fitness for its intended use.

41. As a direct and proximate cause of the Defendants' breach of warranties, as set forth above, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

**Count III - Negligence**

42. Plaintiffs repeat and reallege all the above allegations contained in paragraphs 1-47.

43. Defendants owed to Plaintiffs a duty to use reasonable care in the manufacture, packaging, distribution, and/or sale of their food product, the observance of which duty would have prevented or eliminated the risk that Defendants' food product would become adulterated and/or harmful with any dangerous pathogen. Defendants, however, breached this duty and were therefore negligent.

44. Defendants had a duty to comply with all federal, state, and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of their food product, but failed to do so and were therefore negligent.

45. Plaintiffs were among the class of persons designed to be protected by these statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture,

15

packaging, distribution, and sale of similar food products. Defendants, however, breached this duty and were therefore negligent.

46.     Defendants had a duty to properly supervise, train, and monitor their employees and to ensure that their employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, packaging, and sale of similar food products. Defendants, however, breached this duty and were therefore negligent.

47.     Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects and that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions and that were clean, free from adulteration, and safe for human consumption. Defendants, however, breached this duty and were therefore negligent.

48.     As a direct and proximate result of Defendants' negligence as described above, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

**Count IV – Negligence *Per Se***

49.     Plaintiffs repeat and reallege all the above allegations contained in paragraphs 1-54.

50.     Defendants had a duty to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, distribution, storage, labeling, and sale of the food products that injured Plaintiffs, including the applicable provisions of the Federal Food, Drug and Cosmetic Act, and similar Washington food and public health statutes, and including without limitation the provisions of the Washington Product Liability Act, RCW

7.72 et seq., and the Washington State Retail Food Code, chapter 246-215 WAC, all of which prohibit the sale of any food that is adulterated or otherwise injurious to health

51.    In breach of this duty, the Defendants failed to comply with the provisions of the health and safety acts identified above and, as a result, were negligent *per se* in their manufacture, distribution, packaging, and/or sale of adulterated food.

52.    As a direct and proximate result of conduct by Defendants that was negligent *per se*, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

## DAMAGES

53.    Plaintiffs suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of Defendants, in an amount that shall be fully proven at the time of trial. These damages include but are not limited to past and future pain and suffering, past and future damages for loss of enjoyment of life, past and future emotional distress, past and future medical and related expenses, including pharmaceutical expenses, travel, and travel-related expenses, and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    Ordering compensation for all general, special, incidental, and consequential damages suffered by Plaintiffs because of Defendants' conduct.

17

b. Awarding Plaintiffs costs and expenses, fully including reasonable attorneys' fees allowed by law; and

c. Granting all such additional and/or further relief as this Court deems just and equitable.

DATED: Honolulu, Hawaii, March 10, 2025.

/s/ Michael F. O'Connor
MICHAEL F. O'CONNOR
Attorney for Plaintiffs
JORDAN JAMES SCHAEFER and
EVELYN COTTON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JORDAN JAMES SCHAEFER and EVELYN COTTON,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>COSTCO WHOLESALE CORPORATION, a Washington corporation, SCENIC FRUIT COMPANY, LLC; and CALIFORNIA SPLENDOR INC.,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL NO.:_____

**DEMAND FOR JURY TRIAL**

9560-001/385192

## **DEMAND FOR JURY TRIAL**

Plaintiffs JORDAN JAMES SCHAEFER and EVELYN COTTON, by and through

their attorneys at OGAWA, LAU, NAKAMURA & JEW, hereby demand a trial by jury.

DATED: Honolulu, Hawaii, March 10, 2025.

/s/ Michael F. O'Connor
MICHAEL F. O'CONNOR
Attorney for Plaintiffs
JORDAN JAMES SCHAEFER and
EVELYN COTTON

19